**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

No. 24-1122


LUIS FELICIANO-MUNOZ; AIR AMERICA, INC.,

Plaintiffs-Appellants

v.

FRED J. REBARBER-OCASIO,

Defendant-Appellee.

_____


FRED J. REBARBER-OCASIO,

Plaintiff-Appellee,

v.

LUIS FELICIANO-MUNOZ; CHRISTEL BENGOA; CONJUGAL PARTNERSHIP
FELICIANO-BENGOA,

Defendants-Appellants,

ABC INSURANCE COMPANY,

Defendant.


**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**BRIEF FOR APPELLANTS LUIS FELICIANO-MUNOZ; CHRISTEL BENGOA;**

**CONJUGAL PARTNERSHIP FELICIANO-BENGOA, AND; AIR AMERICA, INC.**

José R. Olmo-Rodríguez
CA1#79544
261 Domenech Ave., SJ PR 00918
787.758.3570/Jrolmo1@gmail.com

## DISCLOSURE STATEMENT

No parent corporation or publicly held corporation owns 10% or more of the stock of Air America, Inc.

## TABLE OF CONTENTS

PAGE

Table of Authorities.........................................iii

I. Jurisdictional Statement...................................1

II. Statement of Issues Presented for Review...................1

III. Statement of the Case....................................6

IV. Summary of Arguments......................................9

V. Arguments................................................12

   Introduction............................................13

   Summary of uncontested facts............................13

   A. AA and Feliciano's contractual claims ...............23

   B. Rebarber' gross negligence claim.....................39

   C. Bias and abuse of discretion.........................54

   D. Double Compensation..................................63

   E. A note on Rebarber...................................64

VI. Conclusion and Relief Sought.............................65

VII. Certificate of Compliance...............................65

VIII. Certificate of Service.................................65

Addendum. . . . . . . . . . . . . . . . . . . . . . . .  67

i

**TABLE OF AUTHORITIES**

PAGE

**Circuit Courts**

Astro-Med, Inc. v. Nihon, 591 F.3d 1 (1st Cir. 2009). . . . . . 63
J.R. v. Gloria, 593 F.3d 73(1st Cir. 2010). . . . . . . . . . .12
Ferrer v. Zayas, 914 F.2d 309(1st Cir. 1990). . . . . . . . . .13
Grajales v. American Airlines, Inc., 194 F.3d 288(1st Cir. 1999).53
Malavé-Felix v. Volvo Car Corp., 946 F.2d 967(1st Cir.1991). . 53
Marquis Theatre Corp. v. Condado Mini Cinema,
846 F.2d 86(1st Cir.1988) . . . . . . . . . . . . . . . . . . .41
Monteagudo v. Asociación de Empleados del
Estado Libre Asociado, 554 F.3d 16470(1st Cir. 2009). . . . . .12
Marshall v. Pérez, 828 F.2d 845(1st Cir. 1987). . . . . . . . .53
Panzardi-Alvarez v. United States, 879 F.2d 975 (1st Cir.1989). 56
Smith v. Kmart Corp., 177 F.3d 19 (1st Cir. 1999) . . . . . . . 63
United States v. Cowden, 545 F.2d 257(1st Cir.1976) . . . . . .56
United States v. Giorgi, 840 F.2d 1022(1st Cir.1988). . . . . .56
United States v. Lopez, 944 F.2d 33 (1st Cir. 1990). . . . . . 56
United States v. Pelletier, 666 F.3d 1(1st Cir.2011). . . . . .13
United States v. Pires, 642 F.3d 1(1st Cir. 2011). . . . . . . 13
Vázquez-Filippetti v. Banco Popular, 504 F.3d 43(1st Cir. 2007).52
Velazquez v. Figueroa-Gomez, 996 F.2d 425, at 427(1993). . . . 29
Wojciechowicz v. United States, 582 F.3d 57(1st Cir. 2009). . . 53
Woods-Leber v. Hyatt Hotels, 124 F.3d 47 (1st Cir. 1997). . . .53
Wortley v. Camplin, 333 F.3d 284(1st Cir. 2003). . . . . . . . .63

**District Courts**

Barreiro-López v. Universal, 98 F.Supp.3d 349(D.P.R. 2015). . .53
FDIC v. Arrillaga-Torrens, 212 F.Supp.3d 312 (2016). . . . . . 40
W. Holding, Inc. v. Chartis Insurance Co.
,845 F.Supp.2d 422(D.P.R.2012). . . . . . . . . . . . . . . . 41
Wyilie v. Stipes, 797 F.Supp.2d 193 (D.P.R.2012). . . . . . . .42

**Puerto Rico Supreme Court**

Arrieta v. De La Vega, 165 D.P.R. 538(2005). . . . . . . . . . 40
Arroyo v. Estado Libre Asociado, 126 D.P.R. 682(1990). . . . . 52
Cárdenas-Maxán v. Rodríguez, 125 D.P.R. 702(1990). . . . . . . 52
Elias v. Chenet, 147 D.P.R. 507, 522 (1999). . . . . . . . . . 41
Jiménez v. Pelegrina Espinet, 112 D.P.R. 700(1982). . . . . . .52
Rivera Sanfeliz v. Junta, 193 D.P.R. 38 (2015). . . . . . . . . 41
Soto-Cabral v. E.L.A., 138 D.P.R. 298(1995). . . . . . . . . . 52

**Delaware Courts**

Cheff v. Mathes, Del.Supr., 199 A.2d 548(1964). . . . . . . . .43

Citron v. Fairchild Camera & Instrument Corp.,
569 A.2d 53(Del.1989) . . . . . . . . . . . . . . . . . . . .42

Graham v. Allis-Chalmers Mfg., Del.Supr., 188 A.2d 125(1963). . 43

In re Lear Corp. Shareholder Litig., 2005 Del. Ch. LEXIS 133, 2005
WL 2130607(Del. Ch. Aug. 26, 2005). . . . . . . . . . . . . .42

In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 67 (Del.Ch.2005).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

McPadden v. Sidhu, 964 A.2d 1262, 1274 (Del.Ch.2008). . . . .42

Michelson v. Duncan, Del.Ch., 386 A.2d 1144 (1978); Del.Supr., 407
A.2d 211 (1979). . . . . . . . . . . . . . . . . . . . . . . .43

Prince v. Bensinger, Del. Ch., 244 A.2d 89(1968). . . . . . . .42

Zimmerman v. Crothall, 2012 WL 707238, 2012 Del.Ch. LEXIS 64
(Del.Ch. Mar. 5, 2012). . . . . . . . . . . . . . . . . . . .42

**Statutes**

Article 4.03 of the General Corporation P.R. Laws Ann. tit. 14 §
3563 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

8 Del.C. § 141(e). . . . . . . . . . . . . . . . . . . . . . . 43

8 U.S.C. section 1329 . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. section 3742(b). . . . . . . . . . . . . . . . . . . .1

28 U.S.C. 1291 . . . . . . . . . . . . . . . . . . . . . . . . .1

**Treatises**

Liability of Corporate Officers and Directors, 2-1,
William E. Knepper & Dan A. Bailey(8th Ed. 2010) . . . . . . . 40

The Business Judgment Rule, Fiduciary Duties of Corporate
Directors, 11, Dennis J. Block et al.,(2009). . . . . . . . . .40

Understanding Corporate Law, 212 Arthur R. Pinto
& Douglass M. Branson (2d ed. 2004). . . . . . . . . . . . . .52

**APPEAL BRIEF FOR THE APPELLANT**

Herein appear Appellants Luis A. Feliciano ("Feliciano"), Crhistel Bengoa ("Bengoa"), the Feliciano/Bengoa conjugal partnership and Air America, Inc. ("AA"), through the subscribing attorneys, and, respectfully, submit the following Brief in support of their Appeal to this Honorable Court:

## I. <u>JURISDICTIONAL STATEMENT</u>

The District Court's jurisdiction over this case was conferred by 8 U.S.C. section 1329. This Court's jurisdiction over this appeal from the district court's judgment, a final order that disposed of all issues before that court, is conferred by 18 U.S.C. 3742(a), and 28 U.S.C. 1291. Judgment was entered on July 1st, 2022, [Addendum (Add.), p.4]. Feliciano filed a motion to set aside judgment or for new trial on March 27th, 2023; Rebarber opposed it on April 10th, 2023, and; Feliciano replied on April 17th, 2023[App., p.,1195,1224 and, 1259, respectively]. The Opinion and Order denying it was filed on December 27th, 2023. [App., p.1296] A timely notice of appeal was filed on January 19th, 2023. Fed. R. App. P. 4(b)(1).

## II. <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

A. Whether the jury erred when it did not find that seller Rebarber violated the contract with buyer Feliciano, in light

of unchallenged evidence that seller Rebarber violated contractual clauses I.C.(ii)., II.D., II.J. and IV.A..

B. Whether the jury erred when it did not find that seller Rebarber violated contractual clause I.C.(ii)., in which he agreed to reimburse AA for any and all operational expenses, or "unrecorded expenses" that should had been incurred in AA, before the execution of the contract, in light of unchallenged "weighty" evidence supporting the operational expenses that AA incurred, after the execution of the contract, which should had been incurred before the execution of the contract.

C. Whether the jury erred when it did not find that seller Rebarber violated contractual clause II.D., in which he represented to buyer Feliciano that AA had operated and was capable to operate to the extent of all its license, permits and certificates, in light of the unchallenged evidence that AA could not operate under its IFR 135 instrument flight authorization because key equipment necessary for said operations, such as the autopilots and radios, were malfunctioning, as corroborated by seller Rebarber's main witness.

D. Whether the jury erred when it did not find that, pursuant to contractual clause IV.A., seller Rebarber had to indemnify

and hold harmless buyer Feliciano from and against all losses, claims, causes of action, obligations, costs, damages, expenses, caused directly or indirectly by breach of the representations and warranties included in Article II, in light of the unchallenged evidence that AA could not operate under its IFR 135 instrument flight authorization because key equipment necessary for said operations, such as the autopilots and radios, were malfunctioning, as corroborated by seller Rebarber's main witness.

E. Whether the jury erred when it did not find that seller Rebarber violated contractual clause II.J., in which seller Rebarber represented to buyer Feliciano, on the day of the execution of the contract, December 14, 2014, that no notices of violations from government entities, corrective action letters, or similar documents have been received by AA, when seller Rebarber admitted, at trial, that, he did not disclose to buyer Feliciano that notice of violations, or a corrective action letter, was received, around September 2014, three months before the execution of the contract, precisely during the negotiation process with buyer Feliciano, which began on August 2014 that led to the signing of the contract.

F. Whether the jury erred in finding Feliciano liable for the closing of AA's operations when it was the consequence of a fatal accident resulting from the error of an FAA approved pilot, who was supervised by an FAA approved Director of Operations, while Feliciano, was not in charge of the pilots, but in charge of sales and marketing.

G. Whether the district court's repeated unfounded statements to the Jury, that Feliciano had "changed his testimony" and provided "prior inconsistent statements", affected buyer Feliciano's credibility before the Jury, thereby, causing bias and prejudice that resulted in the jury rendering a verdict that is contrary to the unchallenged evidence.

H. Whether the District Court abused its discretion allowing Rebarber to misquote the record and testify hearsay over objection by stating that AA had to close operations because Feliciano ordered the Director of Operations to falsify records when there was no evidence to sustain said statements and Rebarber had no personal knowledge of the matter, as he was not involved in AA's operations at that time and did not participate in the NTSB, or FAA, investigations about the fatal accident, thereby, causing bias and prejudice that

resulted in the jury rendering a verdict that is contrary to the unchallenged evidence.

I. Whether the District Court abused its discretion when it allowed Rebarber to recross Feliciano, over objection, on matters that were not covered on redirect which confused the jury and unfairly depicted Feliciano as making false statements to Treasury Department under oath, thereby, causing bias and prejudice that resulted in the jury rendering a verdict that is contrary to the unchallenged evidence.

J. Whether the district court's unfounded statement, in its opinion and order denying new trial, describing Feliciano as obstinate, blame shifting, and obfuscated, while praising Rebarber, together with the district court's unfounded statements to the jury that Feliciano changed his testimony and provided prior inconsistent statements, and the District Court's abuse of discretion in allowing Rebarber to misquote the record and confuse the Jury, show an abuse of discretion and/or bias that warrants a new trial.

K. Whether the district court erred, or abused its discretion, in denying the motion for new trial, in light of the unchallenged "weighty" evidence supporting Feliciano's contractual claim for reimbursement and indemnification and

the total absence of evidence to support Rebarber's stockholder claim.

L. Whether Rebarber, as stockholder, has a right to recover more than the value of his stock.

## III. <u>**STATEMENT OF CASE**</u>

Seller Fred Rebarber ("Rebarber") owned 100% of Air America Inc.'s ("AA") stock. On December 2014, buyer Feliciano entered into a contract with seller Rebarber in which, in exchange of the sum of $1,300,000, buyer Feliciano became the holder of the 80% majority of the stock of a small regional airline, operating out of Puerto Rico and to the neighboring Caribbean islands, called Air America owning six small airplanes. In that manner, buyer Feliciano became AA's president to be in charge of AA's corporate matters, while seller Rebarber kept the remaining 20% of the stock, resigned from his job at AA, and stayed at his home in Florida. [App., p. 1374-1402, 1058-1059]

Soon after buyer Feliciano became president, Chief Pilot, Rafael Fernández ("Fernández"), and record keeper Frank Nieves ("Nieves") informed Feliciano that several key equipment in the airplanes needed repairs, or replacement, some of which impeded instrument flight, thereby substantially limiting AA's operations. A list was made and AA incurred in those operational expenses.

6

To cover said surprise operational expenses Feliciano, personally, and through another corporation owened by him, Yellow Media, Inc. ("YM") had to loan more than $500,000 in equal parts, to AA because, when Feliciano became President, AA's bank account had no funds (except for prepaid flight reservations which were already compromised). With a lot of effort and the loaned funds, Feliciano was able to make AA profitable and to increase operations.

As seller Rebarber had agreed in the contract to reimburse AA for any operational expense that buyer Feliciano had to incur that should had been incurred by seller Rebarber before the execution of the contract and to indemnify Feliciano for any damages suffered as a result of a breach of Rebarber's representations of the airline's capabilities, on 2016, AA and buyer Feliciano sued seller Rebarber for breach of contract because seller Rebarber did not reimburse said operational expenses to AA and/or did not indemnify or hold harmless buyer Feliciano for the breach of seller Rebarber's representation that AA could operate to the full extent of its certificates, permits and licenses, such as flying with instruments, when key equipment such as autopilots and radios were malfunctioning. [App., p.1164] Rebarber answered complaint denying the allegations. [App., p.1172]

On June 2017, one of AA's pilots made an error during a flight and the plane crashed resulting in the death of a passenger.

On September 2017 hurricanes Irma and Maria hit the island of Puerto Rico and adjacent islands causing massive destruction and halting all of the tourism industry on which AA's operations depended, as no one was traveling AA's routes.

In spite of these two hurricanes and the fatal accident, Feliciano was able to keep AA operating.

Unfortunately, on May 2018' the FAA cancelled AA's flight authorization and the company had to close. As repayment of the loan, Feliciano, as President of AA, transferred the title of the remaining airplanes to Yellow Media.

On May 2018 Rebarber sued Feliciano alleging that Feliciano caused the closing of the company and, as a result, the loss of the value of his 20% stock. Rebarber also included meritless claims for loss of reputation, loss of goodwill of the company, and for payment of 20% of the value of the airplanes. [App., p.1178] Feliciano answered the complaint denying the allegations. [App., p.1189] Both cases were consolidated and tried together in a nine-day jury trial in which ten witnesses testified.

On July 1st, 2022, the jury rendered its verdict and the district court entered judgment which was notified on the docket

on July 11th, 2022. The jury found that Rebarber did not breach the contract with Feliciano, but found that Feliciano was grossly negligent in his management of AA. The jury awarded Rebarber damages in the amount of $534,836 attributable to Feliciano, and $141,400 attributable to his wife, Christel Bengoa ("Bengoa"), and the Bengoa/Feliciano Conjugal Partnership. Judgment was issued accordingly. [Add., p.1 and 4, respectively]

On July 27, 2022, Feliciano, Bengoa, the conjugal partnership formed between them, and AA requested the District Court that the jury verdict be vacated and/or a new trial be held which Rebarber opposed, and Feliciano replied. [App., p. 1195, 1224, and 1259, respectively] After various procedural instances, on December 27, 2023, the District Court denied the motion for new trial, amended judgment and/or remittitur. [App., p.1296]

Although the District Court denied the motion, it stated that: "[t]o be clear, the Feliciano Defendants do provide arguably weighty evidence, in the form of these portions of the agreement and the lists created by Mr. González and Mr. Nieves". [App., p.1335]

IV. <u>**SUMMARY OF ARGUMENTS**</u>

The jury erred when it did not find that seller Rebarber violated contractual clause I.C.(ii)., in which he agreed to

reimburse AA for any and all operational expenses, or "unrecorded expenses" that should had been incurred in AA, before the execution of the contract, in light of unchallenged "weighty" evidence supporting the operational expenses that AA incurred, after the execution of the contract, which should had been incurred before the execution of the contract.

The jury erred when it did not find that seller Rebarber violated contractual clause II.D., in which he represented to buyer Feliciano that AA had operated and was capable to operate to the extent of all its license, permits and certificates, in light of the unchallenged evidence that AA could not operate under its IFR 135 instrument flight authorization because key equipment necessary for said operations, such as the autopilots and radios, were malfunctioning, as corroborated by seller Rebarber's main witness.

The jury erred when it did not find that, pursuant to contractual clause IV.A., seller Rebarber had to indemnify and hold harmless buyer Feliciano from and against all losses, claims, causes of action, obligations, costs, damages, expenses, caused directly or indirectly by breach of the representations and warranties included in Article II, in light of the unchallenged evidence that AA could not operate under its IFR 135 instrument

flight authorization because key equipment necessary for said operations, such as the autopilots and radios, were malfunctioning, as corroborated by seller Rebarber's main witness.

The jury erred when it did not find that seller Rebarber violated contractual clause II.J., in which seller Rebarber represented to buyer Feliciano, on the day of the execution of the contract, December 14, 2014, that no notices of violations from government entities, corrective action letters, or similar documents have been received by AA, when seller Rebarber admitted, at trial, that, he did not disclose to buyer Feliciano that notice of violations, or a corrective action letter, was received, around September 2014, three months before the execution of the contract, precisely during the negotiation process with buyer Feliciano, which began on August 2014 that led to the signing of the contract.

The jury erred in finding Feliciano liable for the closing of Air America's operations when it was the consequence of a fatal accident resulting from the error of an FAA approved pilot, who was supervised by an FAA approved Director of Operations, while Feliciano, was not in charge of the pilots, but in charge of sales and marketing.

The district court's unfounded statement, in its opinion and order denying new trial, describing Feliciano as obstinate, blame

shifting, and obfuscated, while praising Rebarber, together with the district court's unfounded statements to the jury that Feliciano changed his testimony and provided prior inconsistent statements, and the District Court's abuse of discretion in allowing Rebarber to misquote the record and confuse the Jury, show an abuse of discretion and/or bias that warrants a new trial.

The district court erred, or abused its discretion, in denying the motion for new trial, in light of the unchallenged "weighty" evidence supporting Feliciano's contractual claim for reimbursement and indemnification and the total absence of evidence to support Rebarber's stockholder claim.

## V. ARGUMENTS

### Standard of Review

The Appellate Court's review of a district court's grant of judgment as a matter of law is de novo. <u>J.R. v. Gloria</u>, 593 F.3d 73, 78 (1st Cir. 2010); <u>Monteagudo v. Asociación de Empleados del Estado Libre Asociado</u>, 554 F.3d 164, 170 (1st Cir. 2009). In applying this standard, the Appellate Court examines the evidence in the light most favorable to the nonmovant and will grant the motion "when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Id. (internal quotation

marks omitted). Even though the court draws all rational inferences from the facts in favor of the plaintiff, "the plaintiff is not entitled to inferences based on speculation and conjecture". Ferrer v. Zayas, 914 F.2d 309, 311 (1st Cir. 1990).

Notwithstanding the above, in this particular case, appellate review is sought under the contention that there was also bias and prejudice against the appellants by the District Court that affected their rights to due process. The corresponding standard of review as to this contention is abuse of discretion.

There was also abuse of discretion in the evidentiary rulings. Evidentiary findings are reviewed for abuse of discretion, United States v. Pelletier, 666 F.3d 1, 5 (1st Cir.2011), and this Honorable Court has reversed when, among other reasons, a decision rests on an erroneous conclusion of law. United States v. Pires, 642 F.3d 1, 10 (1st Cir. 2011).

**Introduction**

Appellants request that this Honorable Court reverses the District Court's rulings and vacates the Jury's verdict because they are against the weight of the evidence in this case; it is reasonably clear that prejudicial error has crept into the record and that substantial justice has not been done.

**Summary of the uncontested facts**

At age 30, Rebarber, who owned auto parts stores, ventured into the aviation industry. [App., p.829-830] Rebarber found that aviation is not "rocket science", nor difficult. [App., p.831-832] Without any previous experience in aviation, Rebarber soon became a pilot, owned several airplanes and aviation certificates. In 2000, Rebarber started AA. By 2014, AA had a fleet of 6 small airplanes, and the necessary licenses, certifications and permits to fly long distances with one pilot with the assistance of an autopilot instead of a second pilot, as is required otherwise, and to fly at night using aviation instruments, which is known as an IFR 135 license or certificate. [App., p.833-839][App., p.1402] Rebarber was not only AA's President but was also its Director of Operations and Chief Pilot. The only supervisory position that Rebarber did not hold at AA was Director of Maintenance who supervises the mechanics. [App., p.859-860,1067-1068]

On September 2013, Rebarber hired Luis González ("González") as a mechanic to conduct maintenance, and repairs, on AA's airplanes. González informed Rebarber about the need to repair and replace equipment and parts and notified Rebarber by even sending photographs over the phone because Rebarber lived in Florida while AA's operations were taking place in Puerto Rico. [App., p.102] On March 2014, González sent an email to Rebarber with a list of the

parts, and equipment, that needed to be repaired or replaced. [App., p.76,79-91][1] On April 2014, Rebarber fired González.

On April 2014, González informed the United States Department of Transportation ("DOT") Whistleblower Unit about the conditions of AA's airplanes. [App., p.111-124,126] As a result, the FAA notified a corrective action letter to AA.[App., p.113,127, 769,1063-1065]

Four months later, on August 20, 2014 Feliciano, through his financial advisor, Moreda, sent a letter of intention to purchase AA to Rebarber. [App., p.892-893,1034] During the negotiations, buyer Feliciano told seller Rebarber that he wanted to operate AA in the whole region, to fill the void left by the closing of American Eagle. Rebarber admitted at trial that the only two airplanes that could serve that purpose were the Cessna and the King Air. [App., p.892-893]

On September 2014, FAA was still actively communicating with Rebarber regarding the corrective action letter prompted by González' whistle blower complaint. However, Rebarber admitted that he did not inform Feliciano about the FAA's corrective action letter, or the ensuing investigation, during the negotiation

---

[1] González also testified about his long career as an aviation mechanic beginning in 1975, including working as Director of Maintenance of an airline and for the US Customs Agency. [App., p. 51-59,79]

process, or at any time. Both processes were taking place simultaneously. [App., p.769,879-880,883,1063-1065]

Finally, on December 14, 2014, buyer Feliciano and seller Rebarber signed the contract in which Feliciano purchased 80% of the shares of AA for $1,300,000. Although it was titled Stock Purchase Agreement ("SPA"), it is more than that, as it also included several other provisions regarding: (1) reimbursements of operational expenses by seller Rebarber to AA; (2) complete majority corporate control by buyer Feliciano; (3) seller Rebarber's warranties and representations to buyer Feliciano that AA had the assets and the equipment to operate to the full extent of its licenses, certificates and permits, and had not received any notices of violations from government entities, corrective action letters, or similar documents, and; (4) seller Rebarber's agreement to indemnify and hold harmless buyer Feliciano from any breach of the representations and warranties made by seller Rebarber, among others. [App., p.1347]

Article I of the agreement is titled "Sale and purchase of shares". Article I.A relates to the price of the purchase of 80%. It makes reference to exhibit A which is a $250,000 note, or lien, in seller Rebarber's favor, on one of AA's airplanes to secure the final payment owed to him from Feliciano under the contract.

Article I.C(ii) provides that **seller Rebarber will reimburse AA for any operational expenses, or "unrecorded expenses" that should have been incurred by seller Rebarber before the execution of the Agreement**.[App., p.1375]

Article I.D relates to the control of the corporation. Item 1.D(i) provides that seller Rebarber would resign as an officer of AA. Article I.D(ii) provides that buyer Feliciano and seller Rebarber would be the sole stockholders and that AA will be managed by the stockholders acting as directors of AA, but with a vote in meetings and consent for decisions equivalent to the percentage that each one held: **buyer Feliciano had 80% and seller Rebarber had 20%**. [App., p.1376]

Article II is titled "Representations and warranties". In Article II.C. seller Rebarber represented to buyer Feliciano that there are **no financial liabilities** that would affect the operations. [App., p.1377]

In Article II.D. **seller Rebarber represented to buyer Feliciano that AA has operated and is capable to operate to the extent of all its licenses, permits, certificates and that no violations to said licenses, permits and certificates have been recorded or are expected**. [App., p.1378]

In Article II.G. seller Rebarber represented to buyer

Feliciano that AA has the title to the corporate assets and that there are no undisclosed liabilities. It makes reference to **exhibit E which contains a list of assets** free of liens. The list of assets includes the planes, certificates, licenses, permits, including but not limited to **IFR 135 authorization** which means using instruments, such as autopilots and radios, allowing for more flights with less pilots. It also includes AA's client list, its phone and domain information, and a list of spare parts and office equipment such as computers. [App., p.1378,1402]

In Article II.H. seller Rebarber represented to buyer Feliciano that AA has paid its **taxes**. [App., p.1378] In Article II.I. seller Rebarber represented to buyer Feliciano that AA had no material **unrecorded debt, contingencies or accrued expenses**. [App., p.1378] This is different than the operational expenses or "unrecorded expenses" of Article I.C.(ii). In Article II.J. seller Rebarber represents to buyer Feliciano that **no notices of violations from government entities, corrective action letters, or similar documents have been received by AA**. [App., p.1379]

In Article II.K. seller Rebarber represents to buyer Feliciano that there was no pending litigation that could affect the operations including **investigations related to aviation**. [App., p.1379]

Article IV is titled "Seller's Indemnity". Article IV.A. provides that seller Rebarber **will indemnify and hold harmless buyer Feliciano from and against all losses, claims, causes of action, obligations, costs, damages, expenses, caused directly or indirectly by breach of the representations and warranties** made by seller Rebarber in Article II. Article IV.B. provides that Feliciano can set off any such claim included in Article IV.A. with the $250,000 note on one of the airplanes which is exhibit A to the agreement. [App., p.1381]

Article IV.C. provides that any claims under Article II.H., relating to taxes, and II.I., relating to unrecorded debt, will be paid by Rebarber, but only the amount if any over $10,000 and to a limit of $70,000. [Add., p.1382] This is different from operational expenses, or "unrecorded expenses" mentioned in Article I.C.(ii).

After executing the agreement Feliciano became majority control stockholder and President of the corporation and with the assistance of AA's Chief Pilot, Fernández, and AA's Director of Maintenance, Nieves, they prepared a list of airplane parts and equipment that already needed to be repaired, or replaced. Some of these equipment, such as the autopilots and radios, were necessary to operate the airline to its full capacity making more and longer

flights with less pilots by virtue of the IFR 135 license. But even the radios that are basic instrumentation were defective at the time of the execution of the agreement. [App., p.217,227,230,233,452,538,615,940,941]

Immediately, buyer Feliciano began taking steps to repair and replace parts and equipment. As AA did not have any capital assets, or funds, to conduct the repairs and purchases of equipment, buyer Feliciano, using personal funds and funds from another of his corporations, Yellow Media, Inc.("YM"), loaned more than $500,000 to AA to pay for those surprise expenses.[2] It took buyer Feliciano approximately six months to make 75% of the repairs and replacements but he had to let go the IFR 135 license, or certificate, because of autopilots could not be repaired. [App., p.335] Although planes could fly with limitations as to destinations and climate conditions, according to Rebarber's main witness, Fernández, buyer Feliciano took the company to a good place. [App., p.535] AA began to flourish and even increase its flight operations. [App., p.987-988]

Pursuant to Articles I.C(ii), II.D., IV.A and IV.B., on November 2015, buyer Feliciano notified seller Rebarber that after

---

2 Rebarber had decapitalized the company taking $200,000 in 2013 and $562,000 in 2014, right before the execution of the contract, leaving only $20,000 cash and $170,000 for prepaid reservations that were already compromised. [App., p. 353,823]

the execution of the agreement, he found that several parts, or equipment, needed repair or replacement, and that buyer Feliciano had to incur in those operational expenses that should had been taken care of by seller Rebarber before the execution of the agreement. Buyer Feliciano requested seller Rebarber to reimburse said operational expenses to buyer Feliciano and/or indemnify buyer Feliciano, pursuant to the contract. Seller Rebarber did not comply with his contractual obligations and did not reimburse, nor indemnify, buyer Feliciano. [App., p.926-927]

Buyer Feliciano, also, notified seller Rebarber that he did not have the funds to pay the remaining purchase balance of $250,000 because he had to loan more than $500,000 to AA to incur in the above-mentioned operational expenses. Feliciano informed Rebarber that Feliciano would sell the airplane with the lien, King Air, to pay the remaining balance to Rebarber. Rebarber did not protest, the plane was sold and Rebarber took the payment of the pending purchase price knowing that it was paid with the funds obtained from the sale of AA's airplane. [App., p.272-273][3]

As seller Rebarber had agreed in the contract to reimburse Feliciano for any operational expense that AA had to incur that

---

3 It is worth noting that Rebarber lied to Jury when he testified that he did not know that the payment of $250,000 that he received was from the sale of the King Air. Therefore, Rebarber did not object to Feliciano's commingling of funds when it was for Rebarber's benefit. [App., p.829]

should had been incurred by seller Rebarber before the execution of the contract and to indemnify Feliciano for any damages suffered as a result of a breach of Rebarber's representations of the airline's capabilities, on 2016 buyer Feliciano sued seller Rebarber for breach of contract because seller Rebarber did not reimburse said operational expenses and/or did not indemnify or hold harmless buyer Feliciano for the breach of seller Rebarber's representation that AA could operate to the full extent of its certificates, permits and licenses, such as IFR 135, when key equipment such as autopilots and radios were malfunctioning.

On June 2017, one of AA's pilots made an error during a flight and the plane crashed resulting in the death of a passenger. [App., p.496,783,1069-1070]

On September 2017, hurricanes Irma and Maria hit the island of Puerto Rico and adjacent islands causing massive destruction and halting all of the tourism industry on which AA's operations depended, thereby no one was traveling AA's routes. [App., p.345]

In spite of these two hurricanes and the fatal accident, Feliciano was able to keep AA operating and, was financially solvent, since according to Rebarber's economic expert, AA had $174,000, in prepaid reservations, at the time of closing. [App., p.811]

Unfortunately, on May 2018 the FAA cancelled AA's flight authorization and the company had to close operations. [App., p.345] As repayment of the $500,000 loan, Feliciano transferred the title of the four remaining airplanes to Yellow Media. [App., p.483-485]

On May 2018 Rebarber sued Feliciano alleging that Feliciano caused the closing of the company and therefore the loss of the value of his 20% stock. Rebarber also included meritless claims for loss of reputation, loss of goodwill of the company, and for a payment of 20% of the value of the airplanes. Feliciano answered complaint denying the allegations.

**A.** **AA's claim for reimbursement and Feliciano's claim for indemnification**

**Applicability of clauses to claims**

The contract provides that all operational expenses, or "unrecorded expenses", that should have been incurred by seller Rebarber prior to the execution of the contract would be Defendant Rebarber's responsibility. Article I, Sale and Purchase of Stocks, paragraph C, part (ii) (Other Deliveries) reads as follows:

> The Corporation and/or Seller [the Defendant] have satisfied 100% of any known accrued expenses and debt of the Corporation. **Any unrecorded or undisclosed expenses and liabilities related with the operations of the Corporation prior to this date (the "Unrecorded Expenses") found by the**

**Purchaser after the date hereof, shall be paid by Seller to the Corporation** upon claim thereof by Purchaser or the Corporation supported by adequate evidence. If Seller fails to reimburse the Corporation, in addition to any rights available at law to collect the Unrecorded Expenses, Purchaser shall have the right to deduct or set-off the Unrecorded Expenses from face value of the Note. **All expenses incurred by the Corporation prior to the date hereof shall run on the account of the Seller**; and all expenses incurred by the Corporation after the date hereof will run on account of the Corporation**. In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered Unrecorded Expenses**. (Emphasis added).

[App., p.1375]

Article II, Seller's Representations and Warranties, paragraph D (Operating Rights, Licenses and Permits) reads as follows:

The Corporation has all operating authority, licenses, franchises, permits, certificates, consents, rights and privileges (collectively "Licenses") as are necessary or appropriate to the operation of its business as now conducted and as proposed to be conducted and which the failure to possess would have a material adverse effect on the assets, operations or financial condition of the Corporation. Such licenses are in full force and effect, no violations have been or are expected to have been recorded in respect of any such Licenses, and no proceeding is pending that could result in the revocation or limitation of any such Licenses. **The Corporation has conducted its business so as to comply in all material respects with all such Licenses**. (Emphasis added).

[App., p.1378]

24

Furthermore, Defendant Rebarber agreed to indemnify Plaintiff Feliciano from and against all costs, expenses, among others, that he may suffer, directly or indirectly, due to Defendant Rebarber's breach of any of the representations and warranties made. Article IV, Seller's Indemnity, paragraph A, reads as follows:

> **Seller agrees to indemnify and save and hold harmless the Purchaser from and against all losses, claims, causes of action, obligations, suits, costs, damages, expenses** (including, without limitation, reasonable attorney's fees and disbursements) **and liabilities which the Purchaser…may suffer or incur or be compelled to or be subject to and which are caused by or arise directly or indirectly by reason of the breach of any representations and warranties of the Seller contained herein**. (Emphasis added).

[App., p.1381]

In light of the above mentioned articles, a reasonable jury would have interpreted the agreement literally regarding the reimbursement of operational expenses, or "unrecorded expenses" and regarding "sellers indemnity", holding Rebarber liable for reimbursements of operational expenses to AA and the purchaser harmless from against "all losses, claims, causes of actions, obligations, suits, damages, expenses, including without limitation, reasonable attorney's fees and disbursements and liabilities which the purchaser, Feliciano, or any of its directors, officers, employees and agents may suffer or incur or be compelled to or be subject to and which are caused by or arise

directly or indirectly, by reason of the breach of any representations and warranties made by Rebarber, as is contained in the agreement." [App., p. 270-272]

The District Court did not pose the question to the Jury asking for an interpretation of the contract, in order to reach its conclusion at the Opinion and Order denying the Rule 59 motion that the jury rejected a specific reading of the contract. [App., p.1333] The contract is evidence to be weighed on its face value and its very clear in each of the different kinds of expenses even making express distinctions between operational expenses, at Article I.C.(ii)., or "unrecorded expenses", and financial obligations, at Article II.C., taxes, at Article II.H., unrecorded debt, contingencies and accrued expenses, at Article II.I. As a matter of fact, claims under Article II.I are limited to claims, related to unrecorded debt, contingencies and accrued expenses[4], over $10,000 and under $70,000. That limit does not apply to reimbursement of operational expenses.

Although the District Court found that Feliciano presented

_____

4 Rebarber testified at trial that accrued expenses are "the rent, utility, things that still do not have an invoice but are in the normal regular proceedings or invoices that you expect during the operation of the business" and that debts of the corporation refer to bank loans. These are business expenses that are different from expenses needed to operate airplanes. [App., p.911]

"weighty evidence", it found that the reimbursements to AA, or the indemnifications to Feliciano, did not apply to expenses in repairs and replacement of parts and equipment needed to operate the airplanes, or in other words, operational expenses, even though the contract literally states so. Ironically, the District Court stated that such clauses would apply to a "gas bill" which is an operational expense because gas is needed to fly, but the same is true as to all of the parts and equipment at issue.

However, Rebarber differs from the District Court's reading of the clear and unambiguous contractual clauses as, in his testimony, he clearly demonstrated a robust understanding that there was liability on his part.

Q. Exhibit Roman Numeral II. I'm going to show you a page. Article 4A on page 8 of the Stock Purchase Agreement. What does it say in that paragraph?
A. **So this is basically my obligation to pay Feliciano** as the conditions that it says there based on -- if you see, this is one sentence. It's a complete paragraph but it does say it's based on, "by reason of breach of any representations and warranties of the seller contained herein." I think, yes, I said there is a complete article in this Stock Purchase Agreement that states my representations and warranties. That's why I agreed to this. **If I breached those representations and warranties, of course, I would be liable for that**.
[App., p. 1006-1007]

Rebarber admitted that the he would be liable to Feliciano for breach of his representations. This is contrary to the District Court's determination that the reimbursement and indemnity clauses

do not apply to operational expenses, as Rebarber plainly admitted it.

Furthermore, the District Court made contradictory expressions that on the one hand, the Jury did not adopt Feliciano's interpretations of the contract, despite the clear language cited regarding the reimbursement, representations and indemnification clauses, II.C.(ii)., II.D., at the same time that it sustained that the contract "*makes plain that "there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth specifically herein.*" [App., p.1334] That is, what the District Court saw as plain language did not negate what was agreed between the parties regarding the reimbursements, representations and indemnification clauses.

**Unchallenged testimony and "weighty evidence, in the form of these portions of the agreement and the lists created by Mr. González and Mr. Nieves"**

In its Opinion and Order denying the motion for new trial, the District Court recognized that: "[t]o be clear, the Feliciano Defendants do provide arguably weighty evidence, in the form of these portions of the agreement and the lists created by Mr. González and Mr. Nieves". [App., p.1335]

However, without there being conflicting testimony or a legitimate question as to the credibility of a witness, and in the face of unchallenged evidence that the same mechanical parts and equipment needed to be repaired or replaced before the execution of the contract, the District Court refused to conclude this fact as established by the evidence. The District Court never referred to the record in order to offer foundation to its exposition under Velazquez v. Figueroa-Gomez*,* 996 F.2d 425, at 427(1993), that a New Trial was not warranted in this case.

AA's claim for reimbursement of all operational expenses incurred for repairs or replacement of parts and equipment relating to AA's airplanes that should have been conducted by Rebarber prior to Feliciano's purchase from Rebarber of 80% of AA's stock, should have been granted. The "weighty" unchallenged evidence demonstrated that the same parts that Feliciano had to repair or purchase new, had been found to be deficient by González, who was AA's mechanic during Rebarber's management barely three months before the execution of the contract.

Rebarber's awareness of these needs was demonstrated with Plaintiff Exhibit #1, which included his own expressions in response to González' list of parts and equipment, without there being an adequate disclosure to Feliciano prior to the contract.

[App., p. 92-93,111-124] In his testimony, González specified having reported this situation to Rebarber. González testified that he made a list of equipment or parts that needed to be replaced or purchased new just a few months before Feliciano took control of AA. [App., p.74-76] González testified that the Cessna had not flown in years and the King Air had pressurization problems and gasoline leaks. González testified about the list that included inoperative autopilots, radios, fuel indicators, communication equipment, inoperative oil gauges, among others. [App., p.98-99,118-126]

AA's Director of Maintenance, Nieves, testified about the list that he and Fernández, prepared after Feliciano became president which included inoperative radios, IFR equipment, leaking fuel tanks. [App., p.220-221,227,229-230] A reasonable jury would have found that these items were the same ones González had identified as requiring repair in a list which predated the stock purchase.

For example, as listed by González prior to the contract and as shown in the list that was made by Chief Pilot Fernández and Director of Maintenance Nieves after the stock purchase, a reasonable jury would have found that the pilot reported that radios were not working, as well as the autopilot systems. [App.,

p.72-73,222] As Director of Maintenance Nieves testified:

"When Mr. Feliciano bought the company, the pilots told Feliciano that to replace all the radios on the airplanes because they weren't working flying right. That was clear, and Mr. Feliciano did what the pilot requested to do."
[App., p. 224]

Nieves specified that the investment required of Feliciano consisted of more than $112,517.47. [App., p. 228] It was specified by Nieves that "the fuel tanks were leaking a long time ago", and were replaced after Feliciano took over. [App., p. 230]

Aviation expert Luis Irizarry ("Irizarry") testified that he compared González' list with the list made by Nieves and Fernández and that: "[i]f they are not the same one, they are very similar". Irizarry also explained that that if a part, or equipment, is repaired, it should not break in a matter of days. [App., p.660-661,694,711] Rebarber did not cross-examine Irizarry on this very important matter. However, Rebarber cross-examined González on whether an airplane could be repaired one day and then the next day, it could break and he answered: "Well, not the same parts, […] if it's fixed appropriately, there is no reason for it to be broken the next day." [App., p.163] Nieves also testified that parts take time to wear. [App., p.225]

Rebarber's Chief Pilot and main witness, Fernández corroborated that key equipment was malfunctioning, under

Rebarber's management, and recognized the list that he made with Nieves. Fernández testified that the autopilots worked sometimes partially, damaged often, and had to be sent to repair over and over. Fernández also testified that radios worked sometimes, broke down constantly after repair and made noises impeding audition and air radio traffic controllers could not hear pilots and vice versa. Fernández also testified about fuel gauges that worked sometimes, distance measuring equipment that worked sometimes, air conditioners that did not cool, broken windshield wipers, broken cap tires, faulty pressurization in the King Air, broken cowlings, and scratched windshields, among other [App., p.126,966,975,977, 979,980-989]

There is no factual dispute regarding González' familiarity with the mechanical parts of the concerning airplanes prior to the contract, and prior to December 17, 2014. The District Court's finding that there was a "potential problem with González's testimony" given "his knowledge was limited in time" only highlights its bias by opting to follow Rebarber's rationale attacking Feliciano's reliance on González's testimony. [App., p.1328] The fact still remains that González had the relevant knowledge of the mechanical parts that needed repair prior to the sale and prior to December 17, 2014. This was an unchallenged fact.

It was also an unchallenged fact that later in time, after the contractual deadline for repairs attached to Rebarber (12/17/2014), the same mechanical parts and equipment still needed repairs. With such unchallenged facts, a reasonable jury should have found that Rebarber had to reimburse AA and indemnify Feliciano. An impartial Court, should have provided a fair remedy at the face of the jury's failure to provide justice. It was not a question of credibility or factual dispute.

There was no indication that González' termination of employment with Rebarber actually challenged González' credibility, as Rebarber testified that he fired González because he did an inspection without using the inspection document note and because he was lazy. Rebarber did not testify that he fired González for any reason having to do with a disagreement about the list of parts and equipment. González never contradicted himself as to any part of his testimony. Finally, Rebarber did not cross-examine González, on the "lists" of parts and whether his list contained the same items as the one prepared by Nieves and Fernández. Rebarber's cross-examination of González was focused on airplanes' logbooks showing that planes were flying, the reason for his termination and that he was not in AA after April 2014 and therefore did not know about conditions of the airplanes at the

time of the execution of the contract. [App., p.191] Thus, the District Court's expressions regarding credibility issues as to this witness find no basis on the record.

Feliciano presented "weighty" and extensive evidence regarding the expenses incurred in the replacement or purchase of the above-mentioned equipment. Feliciano testified about the list of items and about the expenses incurred. [App., p.283,285-296, 301-306,309-310,333-334,353,354,615] Rebarber did not cross-examine him on the items included in the "lists".

In addition, Feliciano's unrebutted testimony, as well as Joint Exhibit #2, the contract of December 17, 2014, along with the pre-purchase list made by González (Plaintiff Exhibit #1) and the list made by Nieves and Fernández (Plaintiff Exhibit #3) were evidentiary demonstrations that any reasonable jury would have considered sufficient to prove that AA had a right to reimbursement from Rebarber, for the operational expenses relating to parts and equipment that had to be made.

Based on Section II.C.(ii). of the contract, a reasonable jury would have found Rebarber was in breach of the obligation to reimburse. Based on the evidence, reimbursement as to Air America should have been found for the Cessna 421 (C421) in the amount of $25,215.50, for one of the Piper Aztec, $639.57, and as to the

other $21,482.44, for the King Air $22,742.28, for the Britain Norman $31,039.68 and for the Whiskey Whiskey $6,100, for a grand total of $112,970.47. [App., p.302-303,320-322]

Although it is titled Stock Purchase Agreement, the contract contains the purchase of stock along representations and warranties from the seller to the buyer as to the operation which Feliciano was purchasing 80% for $1,300,000. It is more than a stock purchase agreement. Thus, it was an agreement to buy the controlling interest in AA with representations and warranties to safeguard Feliciano's investment.

Feliciano testified about the contract which included representations that AA was capable to utilize all its operating rights such as IFR 135. [App., p.262,268] By those representations, Feliciano understood that AA had operating auto pilots because that equipment is necessary for IFR 135 operations. [App., p.269] However, contrary to what was reported by Rebarber, the airplanes operated with limitations, because of all the repairs and replacements of parts and equipment that Rebarber did not do before the execution of the contract, that should had been done.

AA's General Operations Manual ("GOM") makes reference to AA's primary permit, IFR 135. The most comprehensive permit in terms of business is IFR 135 because it allows flying with one

pilot instead of two, at nighttime and to farther destinations. AA's GOM also permits use of autopilot to travel long distance at night with one pilot, instead of two pilots. [103,269,544-555] Several of the key equipment, such as autopilots, needed to return from the most frequented routes were malfunctioning and therefore AA was prevented from making more flights thereby limiting operations and profits. [App., p.547-549] As Rebarber admitted at trial, an autopilot that sometimes work don't comply with IFR 135:

> Q. When you have IFR 135 permit or certificate or license, however, you want to call it, that means that you can fly with instruments, right?
> A. That is correct.
> Q. But for that, you need the instruments to work, right?
> A. That is correct. It is not mandatory to fly IFR.
> Q. An autopilot that sometimes works and sometimes doesn't work. It doesn't comply with IFR 135?
> A. That is correct.
> [App., p. 1049-1050]

Feliciano had to let go of the IFR 135 license because he could not repair the autopilots and did not have the funds to purchase new ones. Rebarber's misrepresentations caused damages to Feliciano and he should be indemnified by Rebarber with the costs of operational expenses. [App., p.335]

**Rebarber's defense**

The contract does not limit the reimbursements or indemnifications to repairs or replacements required by FAA, nor make any reference to the word discrepancies. However, Rebarber

limited his defense to stating that AA's airplanes had passed FAA inspections and that the equipment and parts at issue did not impede the airplanes to fly, but he did not contest that the same parts and equipment needed repairs, or replacements since before the agreement was executed and that he decapitalized the company by extracting $762,000.

Rebarber admitted that one of the airplanes leaked water into the cabin because the airplane vibrated, but that "[a]ll you have to do", is apply "an aviation created silicone". Rebarber denied pressurization problems, when according to González, Nieves, Fernández, Irizarry and Feliciano, there were problems with the pressurization inside the cabin, particularly the King Air. Rebarber minimized the use of said feature. [App., p.866-867] According to Rebarber, a radio that functions partially "is good". [App., p. 1049-1050]

Rebarber did not take advantage of his aviation expert, Ismael Ortiz ("Ortiz") to ask him in detail about the items contained in the list made by González and the one prepared by Nieves and Fernández. Ortiz limited his testimony on that issue to stating that he did not find any of those items written on the airplane logbooks, but did not compare the lists, nor testified that they were different. [App., p.775-776,783-784].

37

A reasonable jury, without inflammatory and undue extrinsic considerations, would have found Rebarber liable to pay, under the contract. The jury verdict is contrary to the weight of the evidence in this crucial aspect which is the origin of the dispute between Feliciano and Rebarber. There is no controversy as to the fact that the same parts and equipment listed by González during Rebarber's management of AA were also found a few months later and placed on a list by Frank Nieves and Rafael Fernández, who was Rebarber's witness, as corroborated by aviation expert Irizarry.

The communication from Rebarber, November 24th 2015 Letter, refusing to conduct a setoff against $250,000 expenses, should have been considered direct evidence of Rebarber's incompliance with the agreement on the record.

**Representation about government notices or corrective action letters**

On August 20, 2014, Feliciano began negotiations to purchase AA. [App., p.1034] Rebarber also admitted that in 2014, during the negotiation process with Feliciano, AA received communication from FAA for corrective action and that two inspectors visited AA and found discrepancies that AA had to correct and that AA sent a correction letter to FAA. [App., p.769,879-880,883] Rebarber did not inform Feliciano about this matter while he represented that

no such documents had been received by AA. [App., p. 1063-1065] As

Rebarber testified:

> "Q. Did you tell Mr. Feliciano, during your negotiations,
> that Mr. González had filed a whistleblower complaint against
> you and the company?
> A. It wasn't relevant. I had fired him. I didn't tell him
> that I had fired anybody. He never asked.
> Q. You are right. It's probably from September, as the
> last entry.
> A. It is more or less from that, from the last entry,
> that's correct.
> Q. And September is after August 20, right?
> A. Sure.
> Q. So you received that letter after Mr. Feliciano was
> already negotiating with you, correct?
> A. I received that letter after what?
> Q. Feliciano had sent you to Mr. Moreda --
> A. September, August, so I received that --
> Q. August is before September, right?
> A. Correct, yes. He just started to negotiate with me,
> that is correct.
> Well, actually no negotiation had been at that
> point. He sent me his intention, what he wanted to do.
> Q. You were notified of possible violations, right?
> A. Exactly, possible."

[App.,p.1063-1064]


**Conclusion**

AA and Feliciano proved their claims and the jury verdict was

unreasonable in light of their unchallenged and "weighty

evidence".

**B.   Rebarber's stockholder claim**

**Applicable law**

Article 4.03 of the General Corporation Act provides that the

directors and officers shall be bound to dedicate to the affairs of the corporation and to the exercise of their duties the attention and care which in a similar position and under analogous circumstances a responsible and competent director or officer would execute in applying his/her business judgment in good faith. Only gross negligence in the exercise of the duties and obligations mentioned above shall result in personal liability. FDIC v. Arrillaga-Torrens, 212 F.Supp.3d 312 (2016); P.R. Laws Ann. tit. 14 § 3563.

The Business Judgment Rule serves as a tool for judicial review. Dennis J. Block et al., *The Business Judgment Rule, Fiduciary Duties of Corporate Directors,* 11 (2009). It shields directors from liability under certain circumstances, creating a presumption in their favor that in making a business decision, directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. It assumes that not all decisions by directors will result in benefit to the corporation or will, with the benefit of 20/20 hindsight, appear to be prudent. William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors,* 2-1 (8th Ed. 2010). Plaintiff must overcome the presumption with competent proof predicated on the substantive elements of the claim. The

presumption does not call for an evidentiary framework different than the one used in other cases in Puerto Rico, where the defendant is presumed to have complied with the duty of care established by law so as to avoid liability unless plaintiff proves otherwise. <u>Arrieta v. De La Vega</u>, 165 D.P.R. 538, 549 (2005). The Plaintiff must so establish by a preponderance of the evidence to prevail as a matter of law. See, <u>Elías v. Chenet</u>, 147 D.P.R. 507, 522 (1999).

Directors and officers are shielded from ordinary negligence claims under Puerto Rico's Business Judgment Rule. <u>W Holding, Inc. v. Chartis Insur. Co., P.R.</u>, 845 F.Supp.2d 422, 429 (D.P.R.2012). As used in Puerto Rico, gross negligence consists of complete lack of care or so small a degree of diligence that justifies the belief that the defendant acted with complete indifference for the interest and welfare of the other party, <u>Chenet</u>, 147 D.P.R. at 522, pursuant to which gross negligence is characterized by a high degree of negligence, such as exists whenever danger is high and care too little or none. It does not include mere errors in judgment. <u>Rivera Sanfeliz</u>, 193 D.P.R. 38 (2015), at 53, n.13.

Puerto Rico models its corporate statutes after Delaware corporate law. *See* <u>Wyilie v. Stipes</u>*,* 797 F.Supp.2d 193, 196 (D.P.R.2012) (citing <u>Marquis Theatre Corp. v. Condado Mini</u>

*Cinema*, 846 F.2d 86, 91 (1st Cir.1988)).    Thus, Puerto Rico derives its controlling precedent from Delaware Supreme Court decisions. *See* <u>Marquis Theatre Corp. v. Condado Mini Cinema</u>, 846 F.2d 86, 91 (1st Cir.1988). Gross negligence constitutes a difficult threshold to reach. In assessing gross negligence claims, a reviewing court looks "for evidence as to whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives." <u>Citron v. Fairchild Camera & Instrument Corp.</u>, 569 A.2d 53, 66 (Del.1989). Gross negligence "involves a devil-may-care attitude or indifference to duty amounting to recklessness." <u>Zimmerman v. Crothall</u>, 2012 WL 707238, at *6, 2012 Del.Ch. LEXIS 64, at *20 (Del.Ch. Mar. 5, 2012) (citing <u>In re Lear Corp. Shareholder Litig.</u>, 2005 Del. Ch. LEXIS 133, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005)). Gross negligence constitutes "reckless indifference or actions that are without the bounds of reason." <u>McPadden v. Sidhu</u>,  964 A.2d 1262, 1274 (Del.Ch.2008). The "<u>intentional dereliction of a known duty</u>," furthermore, "is a higher standard of wrongdoing than gross negligence or recklessness." <u>In re Walt Disney Co. Deriv. Litig.</u>, 906 A.2d 27, 67 (Del.Ch.2005).

Under 8 Del.C. § 141(e), "directors are fully protected in relying in good faith on reports made by officers." <u>Michelson v.</u>

Duncan, Del.Ch., 386 A.2d 1144, 1156 (1978); *aff'd in part and rev'd in part on other grounds,* Del.Supr., 407 A.2d 211 (1979). *See also* Graham v. Allis-Chalmers Mfg. Co.*,* Del.Supr., 188 A.2d 125, 130 (1963); Prince v. Bensinger*,* Del. Ch., 244 A.2d 89, 94 (1968). The term "report" has been liberally construed to include reports of informal personal investigations by corporate officers, Cheff v. Mathes*,* Del.Supr., 199 A.2d 548, 556 (1964).

## Feliciano's role and performance in AA

Feliciano testified that he was experienced in airplane operations having had an airplane towing banner business in which he hired pilots and mechanics and that he personally worked with the sales and marketing. [App., p.248-249] He also testified that in exchange of $1,300,000, Rebarber handled corporate control to Feliciano and Feliciano became President, Secretary and Treasurer of AA, while Rebarber stayed in his home in Florida. [App., p.1058] Although Feliciano was the President of AA, he had no operational control, as reflected in the GOM, but only corporate control and was in charge of sales and marketing. Feliciano hired Molina, as Director of Operations, and Nieves, as Director of Maintenance, who were in charge of the flying operations and had operational control. [App., p.347-348,466-467,498-502,544,550-553]

Within six months Feliciano had already made 75% of the

repairs and replacements, but had to let go of the IFR certificate because of the autopilots could not be repaired. [App., p.335] Even Rebarber's witness, Rafael Fernández, testified that Feliciano did an admirable job, was able to fix the airplanes and was almost able to take the company to the level of American Eagle5 which was Feliciano's goal. [App., p.963] Nieves testified that Feliciano's main interest was to improve the company standards and never held back or denied the execution of all necessary repairs or the investment in the maintenance required for all the aircrafts. [App., p. 224]

Feliciano testified about his daily efforts to fix the airplanes and to make AA better. Feliciano also testified that he and Yellow Media loaned over $500,000 to AA to overcome the difficult situation left by Rebarber: a decapitalized company whose main assets needed more than a $100,000 in repairs and replacements of key parts and equipment. [App., p. 311-334]

Feliciano's wife, Christel Bengoa, was called as Rebarber's witness and testified that Feliciano worked constantly on improving AA and corroborated Feliciano's testimony that they did not earn any dividends on their stock from AA. Bengoa also testified that her husband did not have the intention of closing

---

5 American Eagle was a regional division of American Airlines that traveled around Puerto Rico and neighboring islands.

AA or losing all of their investment. [App., p.353,789-790]

Feliciano's unrebutted testimony summarized losses in AA's operations since he took over: "The bottom line calculated, […] a loss of $1.8 million in this venture." [App., p.352-352] Feliciano did not collect any dividends from the corporation as a stockholder. Neither did his wife. They also lost the value of their 80% of AA's stock, $1,300,000. [App., p.351-353] For this reason, no reasonable juror should have granted Rebarber damages for breach of fiduciary duties in the amount of $534,836 against Feliciano, and $141,400 against Bengoa and the Bengoa/Feliciano Conjugal Partnership. Such verdict is contrary to justice and would result in an unjust enrichment of Rebarber.

**Loans and commingling**

Rebarber decapitalized AA right before the December 2014 sale to Feliciano. Rebarber withdrew $200,000 in dividends in 2013 and $562,000 in dividends in 2014. [App., p.890] For that reason, when the surprise operational expenses emerged, Feliciano and YM had to loan funds to AA. Rebarber wanted to make the Jury believe that it was a bad thing by misquoting the contract to tell the jury that AA could "only" receive loans from financial institutions and that Feliciano and YM were not financial institutions. However, he had to admit that he was misquoting the contract and admitted that the

contract did not prohibit interest-free stockholders' loans. [App., p.1061-1074]

Rebarber testified extensively about Feliciano's use of AA's funds to pay for $250,000 owed to Rebarber, and a $35,000 audiovisual equipment. However, Feliciano testified that at the time that he used said funds, YM and Feliciano had already loaned AA more that those amounts and that he deducted said amounts from his claims of damages. This testimony is corroborated by the documentary evidence of AA's bank statements and financial records. [App., p.572-573] Rebarber also admitted receiving notification that he would get paid from the sale of the King Air; therefore, he knew that he was getting paid with the proceeds of one of AA's assets. [App., p.1072-1073] Rebarber cannot complain about commingling only when it is convenient to him.

Rebarber told the jury that he was going to prove, with evidence, that Feliciano embezzled money from AA. [App., p. 918] But he did not. Rebarber had announced and hired Amanda Capo, who is a certified public accountant, certified financial forensic examiner, and certified fraud examiner, as his expert in forensic accounting and financial fraud, to scrutinize the financial business records of Air America, Feliciano and Yellow Media, Corp. Since at least January of 2019, Capo requested and was provided by

Feliciano with hundreds of financial records for her evaluation as to whether Feliciano mishandled company funds. But he withdrew her from the witness list after she was provided with every single financial record. [App., p.41,350-351] For that reason, Feliciano requested all of Capo's notes, memorandums, reports, and/or any other document prepared by her in relation to this case to be able to decide if Feliciano would call her as Feliciano's witness. Although the District Court found that Capo was a "true expert" and therefore subject to disclosure, it denied the request finding that Feliciano did not show "exceptional circumstances" under Rule 26(b)(4)(D) of the Federal Rules of Civil Procedure to warrant said request and because it was a late request. [App., p.1267,1269,1275,1282,1294-1295] This was another instance of abuse of discretion that prejudiced Feliciano because Feliciano made the request soon after Rebarber failed to include Capo as a witness in the pretrial report and because Feliciano did show exceptional circumstances because Capo was a true expert, she had evaluated all of the voluminous evidence and her failure to present a report surely signaled that she did not find any fraud or embezzlement. Feliciano did not retain his own fraud expert to counter Rebarber's allegations of embezzlement because Feliciano was confident that Rebarber's own witness would prove him wrong at

trial.

The District Court described the loans as dubious financial dealings without any basis on the record. Not even Cao testified as to that. Cao only testified about inaccuracies, or inconsistencies, but not embezzlement and Rebarber did not specifically testified about any embezzlement.

The District Court concluded that Feliciano undermined the financial security by commingling funds. Nonetheless, it was the contrary as those funds allowed AA to operate and make repairs and replacements of equipment that Rebarber did not challenge because Rebarber decapitalized the company right before the contract withdrawing more than half a million dollars ($562,000). [App., p.890]

**Rebarber did not overcome the legal presumption**

Although there was mention that the FAA had made allegations against AA and that the FAA later revoked AA's certificate, there is no evidence of any finding by the FAA about any act or omission by Feliciano personally that led to the revocation. The only evidence on record for the cause of the accident is pilot error. Rebarber did not present evidence to overcome the presumption that Feliciano was not grossly negligent in his management of AA, and therefore, the jury verdict should be vacated, or a new trial be

ordered.

By September 2017, AA suffered three "giant accidents": a fatal airplane accident and the passing of Hurricanes Irma and Maria. After the hurricanes, AA had to reimburse about $100,000 to customers. [App., p.339-345] A reasonable jury would have understood force majeure striking the company's operations at the time. The jury unreasonably inclined themselves against Feliciano for being exposed to extrinsic information which was inflammatory and unduly prejudicial. Specifically, the District Court's unfounded statements without there being adequate relevance, foundation or basis from which to bring them to the attention of the jurors, about inconsistent or changing testimony, the confusing questions about the position of secretary and the misquoting of the record by Rebarber, constituted structural error, for it made the jury become prejudiced against Feliciano. [App., p.358]

The closing was not the result of the errors in the income tax statements, the identity of the secretary or of the resident agent, or the amount of the sale of an airplane. AA did not lose its certificate because Feliciano made "silly errors" on the income tax returns but because of pilot error that resulted in an accident. There is no nexus between Feliciano and the pilot error.

Feliciano made the business decision not to challenge the revocation of the FAA license because all the great efforts to make repairs, the loaning of substantial amounts of money to AA, the loss of business that resulted from the hurricanes and the fatal accident had taken a huge financial toll and Feliciano was emotionally and financially drenched. [App., p. 346]

Feliciano did not create the two hurricanes, nor is to blame for the pilot error. AA had FAA approved staff for all of the necessary positions such as Director of Operations, Chief Pilot and Director of Maintenance. [App., p.216,453,1015]

The failure to conduct meetings of board of directors, or to consult Rebarber on any corporate matters did not cause any damages to Rebarber. Firt of all, Rebarber never requested a meeting of the board of directors. Additionally, Rebarber cannot claim any such damages as he relinquished his decision power to Feliciano for $1.3 million dollars. With 20% of the vote, Rebarber could never defeat Feliciano's 80% vote. Therefore, Rebarber's vote would not have made any difference. The closing of AA was not the result of Feliciano not holding corporate meetings when he had full corporate control with 80% of corporate voting rights for which he paid $1,300,000.

Feliciano's testimony that YM and Feliciano had loaned about

$500,000 to AA in equal parts was also unchallenged. [App., p.310-311] Feliciano's explanation about the mistakes by the accountant in the tax reports also went unchallenged. [App., p.312-313] Feliciano's explanation about the exchange of the huge Hummer for a more practical Ford Econoline also went unchallenged. [App., p.314] Feliciano' explanation about the audiovisual purchase also went unchallenged. [App., p.314-315] Rebarber had all the financial information and withdrew his forensic accounting expert, Amanda Capo, after she had reviewed all of the financial information. [App., p.41,350-351]

AA did not close operations because of financial hardship but because of the accident and the resulting revocation due to pilot error. Therefore, the loans and the setoffs towards the loans for audio system, including the sale of the plane to repay Rebarber, did not cause the closing of AA.

**No causal connection**

To present a jury question Rebarber had to present evidence that Feliciano's grossly negligent acts, if any, were the proximate cause of the alleged damages. Even if Feliciano was grossly negligent, which is denied, there is no causation linking any of Feliciano's acts or omissions to AA's closing.

Liability requires a finding of causation linking the

defendant's breach of care with the asserted loss. Soto-Cabral v. E.L.A., 138 D.P.R. 298, 317 (1995); Arthur R. Pinto & Douglass M. Branson, *Understanding Corporate Law,* 212 (2d ed. 2004); Brau Del Toro, supra at 181. Causality is limited in scope by the obligation to which it refers, for otherwise, damages following a breach may be linked to each other in an endless chain of events. See, Arroyo v. Estado Libre Asociado, 126 D.P.R. 682, 690 (1990)(so stating); Brau Del Toro, supra at 711 (pointing out delimiting principle underlying causation). It is applied through the concept of "adequate causality," meaning, the condition that ordinarily causes the damage, according to common experience. Cárdenas-Maxán v. Rodríguez, 125 D.P.R. 702, 710 (1990); Jiménez v. Pelegrina Espinet, 112 D.P.R. 700, 704 (1982).

In turn, the causal nexus rests on foreseeability. Vázquez-Filippetti v. Banco Popular de Puerto Rico, 504 F.3d 43, 49 (1st Cir. 2007); Barreiro-López v. Universal Ins. Co., 98 F.Supp.3d 349, 356 (D.P.R. 2015). This cannot be satisfied unless the plaintiff proves that the injury was reasonably foreseeable and thus, could have been avoided had the defendant acted with due care. Grajales-Romero v. American Airlines, Inc., 194 F.3d 288, 296 (1st Cir. 1999); Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc., 124 F.3d 47, 50-51 (1st Cir. 1997). Foreseeability does not

mean that the precise risk or the exact result which was encountered should have been foreseen. Malavé-Felix v. Volvo Car Corp., 946 F.2d 967, 972 (1st Cir. 1991); Woods-Leber, 124 F.3d at 50-51.

A negligent defendant is not relieved from liability by an intervening cause that was reasonably foreseeable, even if the intervening cause may have directly caused the harm. Marshall v. Pérez-Arzuaga, 828 F.2d 845, 848 (1st Cir. 1987). Nevertheless, a defendant, even though negligent, will be relieved of liability whenever an intervening cause produces an unforeseeable result. Barreiro-López, 98 F.Supp.3d at 356. Proximate (adequate) cause is not proven if the defendant can show the occurrence of an intervening cause that was not foreseeable. Wojciechowicz v. United States, 582 F.3d 57, 67 (1st Cir. 2009). The breach — if proven — and the surrounding developments interact to dictate the result. Rebarber did not overcome the foreseeability standard as a matter of law, because it was impossible for Feliciano to foresee the passing of Hurricanes Irma and Maria.

**Conclusion**

Rebarber's claims for damages arise from the revocation of AA's airline operating certificate and the subsequent cessation of its operations. However, there is no direct causal link between

Feliciano's actions or oversights and these damages. The revocation and closure were primarily caused by pilot error, compounded by severe business losses resulting from hurricanes Irma and Maria, which devastated the nearby islands serviced by AA. As Fernandez noted, Feliciano effectively managed AA, a sentiment echoed by Bengoa, who affirmed Feliciano's commitment to the company and his efforts to prevent its closure and preserve their investments (see App., p. 790).

Feliciano not only actively worked for AA but also provided interest-free loans that helped the company navigate the challenges created by Rebarber's actions. Despite Feliciano's efforts, the combination of pilot error and the catastrophic impact of the hurricanes ultimately forced AA to cease its operations.

## C.   **Bias and abuse of discretion**

In its presiding of the trial proceedings as well as in its eventual resolution of the Rule 59, New Trial and/or Remittitur Resolution, the District Court erred in favor of Rebarber, demonstrating bias and/or prejudice against Feliciano, as follows. The District Court considered Feliciano's education, social background and economic status as relevant to determining if there was in fact breach of contract and/or gross negligence in compliance with contractual obligations between the parties.  Such

biographical data was indeed irrelevant to the factual controversies before the Jury during trial and before the Court in post-trial remedies resolutions. However, the District Court's analysis of Feliciano's biographical data as opposed to that of Rebarber, demonstrates bias against Feliciano and in favor of Rebarber. While the Court deemed Feliciano as the privileged son of a physician, depicted as a marketing and sales strategist, Rebarber was deemed as a hard-working, self-made airline owner, assisted with almost admiration language by the District Court. [App., p.1318-1327]

The District Court gave much emphasis to the contrast in the parties' backgrounds only to speculate that the Jury must have appreciated Feliciano's lack of specialized skills in aviation as opposed to Rebarber's bottom up build up specialization to resolve the controversies between them. All the while, the evidence regarding breach of contract by Rebarber and lack of evidence regarding gross negligence alleged by Rebarber was not adequately appreciated by the Jury or addressed by the District Court. The District Court's bias and prejudice in this case infected the entire trial process, so as to require reversal. The Trial Judge should have recused himself *sua sponte,* in light of a clear inclination to favor one party over the other. The standard for

determining whether recusal is appropriate under 28 U.S.C. § 455(a) is an objective one; the judge must determine "whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the [movant], but rather in the mind of the reasonable man." <u>United States v. Cowden</u>, 545 F.2d 257, 265 (1st Cir.1976), cert. denied, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). The movant may not rely on mere allegations but must "suppl[y] a factual basis for an inference of lack of impartiality." <u>United States v. Giorgi</u>, 840 F.2d 1022, 1036 (1st Cir.1988). A decision not to recuse is reviewed only for abuse of discretion. Id. at 1034; <u>Panzardi-Alvarez v. United States</u>, 879 F.2d 975, 984 (1st Cir.1989). <u>United States v. Lopez</u>, 944 F.2d 33 (1st Cir. 1990).

## Confusion over corporate matters – Secretary and issuance of corporate resolutions

The District Court, over objection, abused its discretion and allowed Rebarber to recross Feliciano about matters not covered in redirect: particularly who held the position of secretary of AA, to impeach Feliciano. Rebarber's attorney tried to lead Feliciano into answering that he was not the secretary, but that Brenda Guillen was AA's secretary. Rebarber mislead the Jury to believe

that Feliciano was improperly signing AA's corporate resolutions as Secretary because Guillen, who was Feliciano's executive secretary had filled out tax reports and mistakenly placed her name as secretary and signed as AA's secretary. As Feliciano signed that document under oath and did not notice the mistake, Rebarber wanted to make the Jury believe that Feliciano was usurping the position of AA's secretary, or making false statements. Feliciano answered that he was the secretary of AA, as the contract clearly confirmed in the contract. [App., p.487-490,594-595,608]

This led to District Court's comment that the Jury would be confused. Rebarber used this opportunity to mislead the jury. [App., p.594-602] The jury was increasingly confused as to applicable Law of Corporations in Puerto Rico, and the roles of the President, the Secretary, Officers, Directors and Stockholders in the case. In error and/or abuse of discretion, the District Court allowed this confusion to increase by overruling Feliciano's objections in his re-cross examination, which was outside the scope of the direct and re-direct examinations. First, the court, despite timely objections, allowed the continuation of the questioning in re-cross examination outside of the re-direct examination.

"MR. OLMO-RODRIGUEZ: Your Honor, objection, this is not part of the redirect.
THE COURT: Overruled. I have control over what is on redirect and I am overruling that objection." [App., p.583-584]

57

"[…] MR. OLMO-RODRIGUEZ: Very respectfully, I know Your Honor controls the courtroom but we humbly believe we did not ask about this matter in our redirect.

THE COURT: Overruled. You may answer."
[App., p.594]

Second, it was an improper impeachment of Feliciano, to allow numerous and continuous questions regarding a clerical error, which led the jury to be confused as to the Board of Directors of the Corporation, particularly the role of the secretary. [App., p.595-597]

After the jury heard all testimony and arguments on the

confusing nature of the questioning line being allowed on recross,

the District Court realized and acknowledged the predicament:

"THE COURT: I think you have contention between the Stock Purchase Agreement and this unanimous written consent. I will allow you to clear it up if you wish to do so.

MR. MERCADO-RIVERA: Your Honor, I think part of the problem is that same thing that happened with Mr. Feliciano. He said that Rebarber has to sign because he is part of the shareholders, and he is part of Board of Directors. He resigned as an Officer. One thing is the corporation. One thing is the airline. They are different entities even though they may have the same name as Air America. As a matter of fact, we don't know if they selected the secretary, Ms. Guillen. We don't know all of those things. What I'm saying, **Mr. Feliciano testified that it was a silly error, a silly error but it was a sworn statement**." [App., p.601]

Clearly, then, Rebarber did not have a good faith basis to

prompt the impeaching questions regarding the position of the

Secretary in the board of directors. Attorney Mercado-Rivera

himself admitted that there was no knowledge of any information

from which to propose his questioning had any real impeachment

value. They just served to confuse the jury and make Feliciano

58

look bad. The District Court, however, did not strike any of the questions or answers from the record.

"THE COURT: […] you have got the Stock Purchase Agreement. You then have a unanimous consent to action taken without a meeting, signed by both shareholders as directors, indicating that Mr. Feliciano has the authority, as the sole director, to do certain things and they are listed.
So, there is tension between the two. That doesn't mean that Mr. Rebarber was not a continuing shareholder, and it doesn't mean that he was not a director, the way I understand the Stock Purchase Agreement.
But it does mean that for purposes of the things listed in the unanimous consent that Mr. Feliciano had the authority to do certain things by himself. It doesn't mean that Mr. Rebarber's role, as shareholder and director, was totally eclipsed. Only that they had given over the authority, as a shareholder and director, to Mr. Feliciano to do the things listed in the unanimous consent.
So, I don't' know where the – **the jury is going to be miserably confused about this**. So, I don't' know where you want to go with it. […]."
[App., p. 602]

The District Court also allowed over objection testimony from Rebarber that misconstrued the Puerto Rico law of corporations representing to the Jury that Feliciano needed a corporate resolution for every decision that he took as President of AA. [App., p.448-449]

Being as it was, the jury actually got so confused that they rendered an unreasonable verdict determining breach of fiduciary duty, against Feliciano, under these circumstances, and no liability for Rebarber under the contract.

Rebarber did not present evidence that Feliciano was grossly

negligent and certainly did not overcome the presumption that Feliciano acted with a reasonable degree of care, in good faith and in the best interests of AA. When asked about his claim against Feliciano for gross negligence managing the corporation, Rebarber would only refer to Economist Cao, and state conclusory statements, not factual, only to confuse the matter with a defamation claim, which he referred to as "damage to my moral and professional image". [App., p. 1013-1014]

The jury was misled to confuse the legal concept of fiduciary duty and gross negligence in the context of corporate law with other concepts such as defamation and/or tax report errors by an accountant, or made by an executive secretary, not pertinent to the case.

## Highly prejudicial objected testimony about falsification of records

During his direct, Rebarber was asked about AA's certificate and when he began to misquote the evidence and testify about speculative hearsay, Feliciano objected, but the District Court erroneously allowed the testimony.

Q. After December 17, 2014, when was it suspended or revoked or any action taken on that certificate?
A. It was revoked. It was taken away from Mr. Feliciano for not -- they found falsification of documents. They fired --

**MR. OLMO-RODRIGUEZ:** Objection, Your Honor. Misquoting whatever hearsay he is referring to, which we never provided by any findings, but we know about the allegations, not findings. Mr. Rebarber is talking about findings.

**THE COURT:** I may be mistaken, but isn't there evidence that FAA took action and revoked the license? Is that not part of the record already?

**MR. OLMO-RODRIGUEZ:** Yes, yes.

**THE COURT:** In that case, the objection is overruled.

**THE WITNESS:** It's a fact. It came out in all the news not only that they found that that pilot had the crash, his training in that airplane. His records were falsified. The person, his Director of Operations, they took away all of his licenses because of that. It's a fact. It came out everywhere in news, everywhere. The poor guy did it because this gentleman forced him. He was on top of him constantly -- I'm sorry. I'm sorry. [App., p. 888-890]

Over objection Feliciano was improperly cross-examined with allegations that training records were falsified by Director of Operations, Molina. [App., p.503-505] The District Court allowed Rebarber to misquote the evidence and testify that Feliciano ordered Molina to falsify records: a matter that Rebarber had no personal knowledge about. One thing is for the District Court to allow testimony that the FAA found falsification of documents by Molina, but Rebarber was allowed to testify that Feliciano ordered Molina to falsify records. [App., p. 888-890] There is no evidence on the record to sustain said statement and Rebarber certainly was not involved in the NTSB or FAA investigations. Rebarber even announced Molina as his witness but did not present his testimony at trial. Molina was AA's Director of Operations who Rebarber

testified was ordered by Feliciano to falsify records which was
hearsay objected by Feliciano. Rebarber did not elicit said
testimony when he deposed Molina. [App., p. 1027-1028] It was all
surprise malicious testimony that should had not been allowed.
Later on, Rebarber again was allowed to testify hearsay and
misquoted evidence saying that the NTSB also found that the pilot
who caused the accident did not have enough training. Feliciano
had to confront with the document to make him admit that NTSB did
not make that finding. [App., p. 1069-1071]

**Changed testimony**

With no basis on the record, the District Court stated before
the Jury twice that Feliciano changed his testimony, twice that
Feliciano testified something different before and once that
Feliciano had provided prior inconsistent testimony. [App., p.315-
318] These statements destroyed Feliciano's credibility and caused
prejudice on the jury to the extent that it failed to evaluate the
unchallenged and "weighty" evidence of Feliciano's claim and the
absence of evidence to prove Rebarber's claims.

**Obstinacy, blame-shifting and obfuscation**

The District Court made clear its prejudice when it also,
without any basis on the record, stated in its Opinion and Order
denying the motion to set aside the judgment that Feliciano was

obstinate, blame-shifting and obfuscated. [App., p.1353]

## Conclusion

The District Court's bias and/or abuse of discretion deprived Feliciano of a fair trial, therefore, a new trial is warranted.

### D.   Goodwill is double compensation

When analyzing the verdict rendered by the jury, it is evident that they based their damages award attributable to Feliciano in the amount of $534,836, which is the sum of what Cao testified was 20% of the goodwill value of Air America ($209,836) and the value of 20% of the stocks in Air America (325,000), at the time of the 2014 80% stock purchase. [App., p.816-817]

The goodwill of AA, like that of any corporation, significantly influences the value of its shares. Therefore, awarding Rebarber both the stock value and an additional sum for goodwill constitutes double compensation, amounting to unjust enrichment. As Rebarber aptly stated during the trial, 'I did not sell airplanes. I sold the shares of the company to Feliciano,' emphasizing that 'stock gives you proof that you own all the assets in the corporation,' including goodwill as a critical corporate asset. [App., p. 904, 1044]

Alternatively, remittitur should be considered, as the jury's

verdict exceeds any rational assessment or estimation of damages supported by the evidence presented: 'In the light most favorable to the prevailing party, Rebarber can only be awarded the market value of the stock' (Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 2009), quoting Smith v. Kmart Corp., 177 F.3d 19, 29 (1st Cir. 1999)). According to the evidence, which showed the company's assets were overvalued due to unreliable airplane log books that failed to disclose the true condition, the maximum value of 20% of the company could never exceed $325,000.

The awards granted by the jury lack substantial basis in the evidence, being grossly excessive, disproportionate, and shocking to the conscience. Allowing them to stand would constitute a denial of justice.

### E.    A note on Rebarber

Although we are not contesting his credibility, it is essential to note that Rebarber's testimony should carry no weight due to his dishonesty on multiple occasions during his testimony. Firstly, Rebarber falsely claimed he had never been taken to court by someone owed money. When confronted with evidence of a previous attorney obtaining a judgment against him for unpaid fees, Rebarber initially denied anyone else pursuing legal action against him, only to later admit that the mother of an illegitimate child had

indeed taken him to court (see App., p. 1056-1058).

Furthermore, he lied about his inability to secure employment due to Feliciano's lawsuit against him. During his direct testimony, he asserted he operated a successful business loaning money (see App., p. 1019, 1022, 1025, 1026).

Additionally, throughout the trial, Rebarber repeatedly used derogatory terms such as 'crazy' (see App., p. 851, 852, 854), 'foolish' (see App., p. 886), 'stupid' (see App., p. 853), and 'nonsense' (see App., p. 866, 886, 909, 918, 928, 940, 1055) to refer to Feliciano or his witnesses.

Given Rebarber's numerous inconsistencies and falsehoods on record, his testimony should not have been considered reliable or used to characterize events. The jury was undoubtedly misled and confused by his unreliable statements.

## VI. <u>CONCLUSION AND RELIEF SOUGHT</u>

A reasonable jury and, an impartial judge, would have found in favor of Feliciano's claim for reimbursement, and would have not found there was any breach of fiduciary duty on the part of Feliciano.

WHEREFORE, Luis A. Feliciano, Christel Bengoa, the conjugal partnership formed between them, and Air America, Inc. request

that the Honorable Court of Appeals for the First Circuit vacates the judgment and vacates the verdict against Feliciano, Bengoa and their conjugal partnership, and/or reverses the District Court's Resolution for New Trial and/or Remittitur in this case.

VII. **CERTIFICATE OF COMPLIANCE**

The undersigned counsel for Appellant certifies that the foregoing Brief complies with the type-volume limitations under Rule 32 (a) (7) (B) (I) of the Federal Rules of Appellate Procedure and the Local Rules for the U.S. Court of Appeals, First Circuit.

The Brief has been prepared using 12-point Courier New typeface in Microsoft Word and Adobe software. Exclusive of the table of contents, table of citations, addendum and certificate of service, the Brief is 65 pages long and contains 13,681.

**VIII. CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this same date I have served by sending by first class mail two (2) true and correct copies of this appeal brief to the counsel of record: Mariana Bauza, Assistant U.S. Attorney Chardon Tower 16th floor, #350 Chardon Ave., H.R., P.R. 00918.

In San Juan, Puerto Rico, this 8th day of July 2024.

S/José R. Olmo-Rodríguez
**JOSE R. OLMO RODRIGUEZ, ESQ.**
261 Domenech, SJ PR 0918-1611
(787)758-3570/Jrolmo1@gmail.com

No. 24-1122


LUIS FELICIANO-MUNOZ; AIR AMERICA, INC.,

Plaintiffs-Appellants

v.

FRED J. REBARBER-OCASIO,

Defendant-Appellee.

_____


FRED J. REBARBER-OCASIO,

Plaintiff-Appellee,

v.

LUIS FELICIANO-MUNOZ; CHRISTEL BENGOA; CONJUGAL PARTNERSHIP
FELICIANO-BENGOA,

Defendants-Appellants,

ABC INSURANCE COMPANY,

Defendant.


**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

1. Verdict . . . . . . . . . . . . . . . . . . . . . . . 1

2. Judgment. . . . . . . . . . . . . . . . . . . . . . .4

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| FRED J. REBARBER-OCASIO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 3:18-cv-01218-JAW |
| | ) |
| LUIS FELICIANO-MUNOZ, et al. | ) |
| | ) |
| Defendants. | ) |
| ———————————— | ) |
| | ) |
| LUIS FELICIANO-MUNOZ, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 3:16-cv-02719-JAW |
| | ) |
| FRED J. REBARBER-OCASIO, | ) |
| | ) |
| Defendant. | ) |

*Received & Filed in Open Court on 7/1/2022 at 10:42 am*

## **JURY VERDICT FORM**

**SECTION I**

1. Has Mr. Rebarber proved by a preponderance of the evidence that Mr. Feliciano acted with gross negligence in his management of Air America, Inc., in breach of his fiduciary duty to Mr. Rebarber as a shareholder?

    YES __X__ NO_____

    *(If you have answered "YES" to Question 1, proceed to Question 2. If you answered "NO" to Question, proceed to Section II, Question 1)*

2. What damages, if any, do you find Mr. Rebarber has proven by a preponderance of the evidence that he sustained as a consequence of Mr. Feliciano's breach of his fiduciary duty?

    Damages Award Attributable to Mr. Feliciano:  $ 534,836.00

    *(Answer this question only if you have answered "YES" to Question 1. If you have answered "NO" to Question 1, go to Section II, Question 1)*

3. Do you find by a preponderance of the evidence that Ms. Christel Bengoa and the Bengoa/Feliciano Conjugal Partnership benefitted from Mr. Feliciano's actions?

YES __X__ NO _____

*(Answer this question only if you have answered "YES" to Question 1. If you have answered "NO" to Question 1, go to Section II, Question 1)*

4. What damages, if any, do you find Mr. Rebarber has proven by a preponderance of the evidence that he sustained as a consequence of Mr. Feliciano's breach of his fiduciary duty?

Damages Award Attributable to
Ms. Christel Bengoa and the
Bengoa/Feliciano Conjugal Partnership:   $  141,400.⁰⁰

*(Answer this question only if you have answered "YES" to Question 1 and Question 3. If you have answered "NO" to Question 1 and Question 3, go to Section II, Question 1)*

## SECTION II

1. Has Mr. Feliciano proven by a preponderance of the evidence that Mr. Rebarber breached the contract that he made with Mr. Feliciano?

YES _____ NO __X__

*(If you answered "NO," sign and date the form. If you answered "YES" continue to the Question 2)*

2. What damages, if any, do you find Mr. Feliciano has proven by a preponderance of the evidence that he sustained as a consequence of Mr. Rebarber's breach of their contract?

Damages Award:                    $_____

3. What damages, if any, do you find Air America, Inc. has proven by a preponderance of the evidence that it sustained, as a third party beneficiary to the contract between Mr. Feliciano and Mr. Rebarber, as a consequence of Mr. Rebarber's breach of the contract?

Damages Award:                $_____

*Please sign and date the form.*

Date: 7-1-22

Time: 0950

_____
Jury Foreperson

4

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| FRED J. REBARBER-OCASIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:18-cv-01218-JAW |
| | ) | |
| LUIS FELICIANO-MUNOZ, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| LUIS FELICIANO-MUNOZ, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:16-cv-02719-JAW |
| | ) | |
| FRED J. REBARBER-OCASIO, | ) | |
| | ) | |
| Defendant. | ) | |

## **JUDGMENT**

This action came on for trial before the Court and a jury, the Honorable John A. Woodcock, Jr., United States District Judge, presiding. The issue having been duly tried and the jury having rendered its verdict on July 1, 2022 (Verdict was received before Honorable Judge Aida Delgado-Colón);

JUDGMENT is hereby entered in favor of Mr. Fred J. Rebarber-Ocasio and against Mr. Luis Feliciano-Muñoz in the amount of five hundred thirty-four thousand, eight hundred thirty-six dollars ($534,836.00) in the matter *of Fred J. Rebarber-Ocasio v. Luis Feliciano-Muñoz, No. 3:18-cv-01218-JAW* for damages

caused by Mr. Luis Feliciano-Muñoz's gross negligence in his management of Air America, Inc., in breach of his fiduciary duty to Mr. Rebarber-Ocasio as a shareholder.

JUDGMENT if further entered in favor of Mr. Fred J. Rebarber-Ocasio and against Ms. Christel Bengoa and the Bengoa/Feliciano Conjugal Partnership in the amount of one hundred forty-one thousand, four hundred dollars ($141,400.00). Mr. Luis Feliciano-Muñoz is liable for the total damages in the amount of five hundred thirty-four thousand, eight hundred thirty-six dollars ($534,836.00); whereas Ms. Christel Bengoa and the Bengoa/Feliciano Conjugal Partnership are joint and severally liable for only a portion of the total damages in the amount of one hundred forty-one thousand, four hundred dollars ($141,400.00).

MARIA ANTONGIORGI-JORDAN, ESQ.
Clerk of Court

By:   s/ *Sulma López-Defilló*
Deputy Clerk

Dated this 1st day of July 2022.